

ORIGINAL

1   Christopher T. Heffelfinger (Bar. No. 118058)
2   **BERMAN DEVALERIO LLP**
    One California Street, Suite 900
3   San Francisco, California 94111
    Telephone: (415) 433-3200
4   Facsimile: (415) 433-6382
    Email: cheffelfinger@bermandevalerio.com
5
    *Local Counsel for Plaintiff*
6   *Haverhill Retirement System*
7
    Christopher J. Keller (*pro hac vice pending*)
8   Michael W. Stocker (Bar No. 179083)
    Rachel A. Avan (*pro hac vice pending*)
9   **LABATON SUCHAROW LLP**
    140 Broadway
10  New York, New York 10005
    Telephone: (212) 907-0700
11  Facsimile: (212) 818-0477
    Email: ckeller@labaton.com
12  mstocker@labaton.com
    ravan@labaton.com
13
14  *Counsel for Plaintiff Haverhill Retirement System*
15
                  UNITED STATES DISTRICT COURT
16              NORTHERN DISTRICT OF CALIFORNIA

FILED
APR 08 2013
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**CRB**

17

18  HAVERHILL RETIREMENT SYSTEM,          )  Case No.:  **CV 13 1566**
    Individually and On Behalf of All Others  )
19  Similarly Situated,                   )
                                          )
20                          Plaintiff,    )  **COMPLAINT FOR VIOLATION OF**
                                          )  **THE FEDERAL SECURITIES LAWS**
21                                        )
              vs.                         )  CLASS ACTION
22                                        )
    IMPAX LABORATORIES, INC., LARRY       )  DEMAND FOR JURY TRIAL
23  HSU, ARTHUR A. KOCH, and BRYAN M.     )
    REASONS,                              )
24                                        )
                                          )
25                          Defendants.   )
                                          )
26

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1        Plaintiff Haverhill Retirement System ("Haverhill" or "Plaintiff") makes the following

2    allegations based upon the investigation of Plaintiff's counsel, which included a review of U.S.

3    Securities and Exchange Commission ("SEC") filings by Impax Laboratories, Inc. ("Impax" or

4    the "Company"), as well as regulatory filings and reports, securities analysts' reports and

5    advisories about the Company, press releases and other public statements issued by the

6    Company, and media reports about the Company. Plaintiff believes that substantial additional

7    evidentiary support will exist for the allegations set forth herein after a reasonable opportunity

8    for discovery.

9                                    **NATURE OF THE ACTION**

10    1.      This is a federal securities class action brought on behalf of all persons who

11    purchased or otherwise acquired the publicly-traded common stock of Impax (the "Class")

12    between February 25, 2011 and March 4, 2013, inclusive (the "Class Period"), seeking to pursue

13    remedies under the Securities Exchange Act of 1934 (the "Exchange Act") against Impax and

14    certain of its officers and/or directors.

15    2.      Impax is a specialty pharmaceutical company engaged in the development,

16    manufacture, and marketing of bio-equivalent pharmaceutical products, referred to as generics,

17    in addition to the development of branded products.

18    3.      During the Class Period, Defendants violated the federal securities laws by

19    disseminating false and misleading statements to the investing public regarding manufacturing

20    deficiencies at the Company's Hayward, California manufacturing facility (the "Hayward

21    Facility"), including the effect the deficiencies would have on the Company's ability to gain

22    U.S. Food and Drug Administration ("FDA") approval for RYTARY™ ("Rytary"), an

23    extended-release drug for treatment of Parkinson's disease. As a result of Defendants' false

24    statements, Impax's stock traded at artificially inflated prices during the Class Period, reaching a

25    high closing price of $28.73 per share on May 10, 2011.

26    4.      Defendants' deception came to light when, on March 4, 2013, Impax announced

27    that the FDA had completed an inspection of the Company's Hayward Facility. According to

28    the Company, the FDA's inspection covered three areas. First, it included a re-inspection of the

1    Hayward Facility, related to a warning letter the FDA issued in May 2011, to verify the

2    implementation of corrective actions by the Company.  Second, the FDA performed a

3    Pre-Approval Inspection for Rytary, as analytical method validation and a portion of the

4    stability data were generated at the Hayward Facility.  Third, it evaluated the Hayward Facility's

5    compliance with general good manufacturing practices.  Based on its inspection, the FDA issued

6    a new Form 483, which is a form used by the FDA to document and communicate deficiencies

7    in a company's quality system discovered during an on-site inspection.  In the Form 483, the

8    FDA cited twelve "observations," or problems, at the Hayward Facility requiring remediation,

9    including three repeat manufacturing problems that had not been corrected following prior FDA

10    inspections.

11        5.      During a conference call hosted by the Company that day, the Company further

12    revealed that, due to the manufacturing deficiencies, it did not expect to be able to launch

13    Rytary or a generic version of Concerta, a drug for the treatment of attention deficit disorder and

14    attention deficit hyperactivity disorder, until 2014.

15        6.      Concurrently, on March 4, 2013, Impax filed a Form 8-K with the SEC providing

16    a redacted version of the Form 483.

17        7.      On this news, Impax's stock declined $5.20 per share, or 26 percent, to close at

18    $14.80 per share on March 5, 2013, on extraordinary trading volume.

19        8.      The true facts, which were known by the Defendants but concealed from the

20    investing public during the Class Period, were as follows:

21            (a)      the Company failed to maintain proper quality control and manufacturing

22    practices at its Hayward Facility in violation of current Good Manufacturing Practices

23    ("cGMPs");

24            (b)      the Company failed to take proper remedial actions to correct quality

25    control issues previously identified by the FDA in prior inspections of the Hayward Facility;

26            (c)      the extent of the adverse effect that the manufacturing deficiencies at the

27    Hayward Facility could have on the Company's ability to successfully launch its new drug,

28    Rytary; and

1        (d)     as a result of the foregoing, Impax lacked a reasonable basis for its

2  positive statements about the Company and its outlook, including statements about its ability to

3  launch Rytary or generic Concerta in 2013.

4        9.     As a result of Defendants' false statements, Impax common stock traded at

5  artificially inflated levels during the Class Period. However, as the truth about Impax's quality

6  control and manufacturing processes and their effects on the Company's business was gradually

7  revealed to investors, the Company's share price dramatically declined.

8                             **JURISDICTION AND VENUE**

9        10.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a)

10  of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder

11  by the SEC [17 C.F.R. § 240.10b-5].

12        11.    This Court has jurisdiction over the subject matter of this action pursuant to

13  Section 27 of the Exchange Act, 28 U.S.C. § 1331 [15 U.S.C. § 78a(a)].

14        12.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 28

15  U.S.C. § 1391(b), because many of the acts and practices complained of herein occurred in

16  substantial part in this District. Many of the acts and transactions that constitute the violations

17  of law complained of herein, including the dissemination to the public of untrue statements of

18  material facts, occurred in this District.

19        13.    In connection with the acts and conduct alleged in this complaint, Defendants,

20  directly or indirectly, used the means and instrumentalities of interstate commerce, including,

21  but not limited to, the mails and interstate wire and telephone communications.

22                                 **PARTIES**

23        14.    Plaintiff Haverhill, a contributory retirement system for public employees in

24  Haverhill, Massachusetts, purchased the common stock of Impax during the Class Period, as set

25  forth in the certification attached hereto, and was damaged as the result of Defendants'

26  wrongdoing as alleged in this complaint.

27        15.    Defendant Impax is a specialty pharmaceutical company that develops,

28  manufactures, and markets bio-equivalent pharmaceutical products and develops branded

1 products. The Company's stock is listed on the NASDAQ Global Select Market (the

2 "NASDAQ") under the ticker symbol "IPXL."

3     16.    Defendant Larry Hsu ("Hsu") is, and at all relevant times was, the Company's

4 Chief Executive Officer ("CEO"), President, and a member of the Company's Board of

5 Directors.

6     17.    Defendant Arthur A. Koch ("Koch") was, at relevant times and until his

7 resignation on June 29, 2012, Chief Financial Officer ("CFO") of the Company. Defendant

8 Koch served as the Company's Senior Vice President, Finance, until March 14, 2011, when he

9 was named Executive Vice President of Finance, a role from which he also resigned on

10 June 29, 2012.

11     18.    Defendant Bryan M. Reasons ("Reasons") is, and has been since

12 December 13, 2012, the Company's CFO and Senior Vice President of Finance. Prior to his

13 appointment, Reasons served as the Company's Acting CFO following Defendant Koch's

14 June 29, 2012 resignation.

15     19.    The defendants referenced above in paragraphs 16 through 18 are referred to

16 herein as the "Individual Defendants."

17     20.    During the Class Period, the Individual Defendants, as senior executive officers

18 and/or directors of Impax, were privy to confidential and proprietary information concerning

19 Impax, its operations, regulatory data, and information related to the ongoing quality control

20 processes within the Company. The Individual Defendants also had access to material adverse,

21 non-public information concerning Impax, as discussed in detail below. Because of their

22 positions with Impax, the Individual Defendants had access to non-public information about the

23 Company's business, quality control, and regulatory information through access to internal

24 corporate documents, conversations and connections with other corporate officers and

25 employees, attendance at management and/or board of directors meetings and committees

26 thereof, and through reports and other information provided to them in connection therewith.

27 Because of their possession of such information, the Individual Defendants knew, or with

28

1    deliberate recklessness disregarded, that the adverse facts specified herein had not been

2    disclosed to, and were being concealed from, the investing public.

3    21.    The Individual Defendants are liable as direct participants in the wrongs

4    complained of herein. In addition, the Individual Defendants, by reason of their status as senior

5    executive officers and/or directors, were "controlling persons" within the meaning of Section

6    20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in

7    the unlawful conduct complained of herein. Because of their positions of control, the Individual

8    Defendants were able to, and did, directly or indirectly, control the conduct of Impax's business.

9    22.    The Individual Defendants, because of their positions with the Company,

10   possessed the power and authority to control the contents of Impax's quarterly reports, press

11   releases, and presentations to securities analysts, money and portfolio managers, and

12   institutional investors, i.e., the market. They were provided with copies of the Company's

13   reports and press releases alleged herein to be misleading prior to or shortly after their issuance

14   and had the ability and opportunity to prevent their issuance or cause them to be corrected.

15   Because of their positions with the Company, and their access to material, non-public

16   information, the Individual Defendants knew that the adverse facts specified herein had not been

17   disclosed to and were being concealed from the public, and that the positive representations

18   being made were then materially false and misleading. The Individual Defendants are liable for

19   the false statements pleaded herein.

20   23.    As senior executive officers and/or directors and as controlling persons of a

21   publicly-traded company whose common stock is registered with the SEC, traded on the

22   NASDAQ, and governed by the federal securities laws, the Individual Defendants had a duty to

23   promptly disseminate accurate and truthful information with respect to Impax's business,

24   quality control, regulatory oversight, the outlook for the Company's products, and present and

25   future business prospects, and to correct any previously issued statements that had become

26   materially misleading or untrue so that the market price of Impax's common stock would be

27   based upon truthful and accurate information. The Individual Defendants' misrepresentations

28   and omissions during the Class Period violated these specific requirements and obligations.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                          5

1

**FRAUDULENT CONDUCT AND COURSE OF BUSINESS**

2     24.    Defendants are liable for: (1) making false statements; or (2) failing to disclose

3  adverse facts known to them about Impax. Defendants' deception was a success, as it:

4  (1) misled the investing public regarding Impax's prospects and business; (2) artificially inflated

5  the prices of Impax's common stock; and (3) caused Plaintiff and other members of the Class to

6  purchase Impax's common stock at inflated prices.

7

**BACKGROUND**

8     25.    Impax, a specialty pharmaceutical company, engages in the development,

9  manufacture, and marketing of bioequivalent pharmaceutical products. The Company operates

10  in two divisions: (1) Global Pharmaceuticals; and (2) Impax Pharmaceuticals. The Global

11  Pharmaceuticals division develops, manufactures, sells, and distributes generic pharmaceutical

12  products. This division provides its generic pharmaceutical prescription products directly to

13  wholesalers and retail drug chains, and generic pharmaceutical over-the-counter and

14  prescription products through unrelated third-party pharmaceutical entities, in addition to

15  offering research and development services. The Impax Pharmaceutical division develops

16  proprietary brand pharmaceutical products for the treatment of central nervous system disorders,

17  including epilepsy, migraine, multiple sclerosis, Parkinson's disease, and restless leg syndrome,

18  and promotes third-party branded pharmaceutical products. Impax markets and sells its generic

19  pharmaceutical prescription drug products in the continental United States and the

20  Commonwealth of Puerto Rico.

21     26.    Impax has historically focused on generic drugs, which offer notably lower

22  margins than branded drugs. In 2008, the Company launched its branded products division in

23  an effort to diversify its revenue base. Rytary, an extended-release capsule formulation of

24  carbidopa-levodopa that is also known as IPX066, is the first drug that Impax sought to take

25  through the entire FDA approval process for new drugs.

26     27.    Impax has two manufacturing facilities, one in Hayward, California, where the

27  Company is based, and one in Taiwan. The Company conducts most of its research and

28  development activities at the Hayward Facility.

28.     The FDA and Impax have been at odds over practices at the Hayward Facility since at least 2010. Between December 13, 2010 and January 21, 2011, the FDA conducted an inspection of the Hayward Facility.

29.     On February 24, 2011, Impax issued a press release announcing its financial results for the fourth quarter and full year of 2010. The Company reported net income of $15.3 million, or $0.23 in diluted earnings per share ("EPS"), for the fourth quarter of 2010. Additionally, the Company reported net income of $195.6 million, or $2.98 in diluted EPS, for the full year of 2010. The release stated in part:

> "We are optimistic that 2011 will bring additional positive developments as we recently completed the ADVANCED-PD Phase III study for IPX066 and look forward to the top line data release in the second quarter of 2011. We continue to progress toward filing the new drug application in the U.S. in the fourth quarter of 2011."

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

30.     During the trading day on February 25, 2011, Impax filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2010, which included the same results previously reported in the Company's February 24, 2011 press release. As part of the Company's description of its business, it provided the following information about its quality control practices and policy:

Quality Control

> In connection with the manufacture of drugs, the FDA requires testing procedures to monitor the quality of the product, as well as the consistency of its formulation. We maintain a quality control laboratory that performs, among other things, analytical tests and measurements required to control and release raw materials, in-process materials, and finished products, and to routinely test marketed products to ensure they remain within specifications.

> Quality monitoring and testing programs and procedures have been established by us in our effort to assure that all critical activities associated with the production, control, and distribution of our drug products will be carefully controlled and evaluated throughout the process. By following a series of systematically

> organized steps and procedures, we seek to assure that established quality standards will be achieved and built into the product.
>
> Our policy is to continually seek to meet the highest quality standards, with the goal of thereby assuring the quality, purity, safety and efficacy of each of our drug products. We believe that adherence to high operational quality standards will also promote more efficient utilization of personnel, materials and production capacity.

The Company's 2010 Form 10-K further discussed risk factors related to quality control, but offered no warning as to the then-current state of quality control problems that Impax was experiencing or their effect on the Company's operations and prospects.

31. The Company's 2010 Form 10-K included, as Exhibit 31.1, a certification signed by CEO Hsu that stated:

> I, Larry Hsu, certify that:
>
> 1. I have reviewed this Annual Report on Form 10-K for the fiscal year ended December 31, 2010 of Impax Laboratories, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

1

2          b.      Designed such internal control over financial
reporting, or caused such internal control over financial reporting
to be designed under our supervision, to provide reasonable
3      assurance regarding the reliability of financial reporting and the
preparation of financial statements for external purposes in
4      accordance with generally accepted accounting principles;

5          c.      Evaluated the effectiveness of the registrant's
disclosure controls and procedures and presented in this report our
6      conclusions about the effectiveness of the disclosure controls and
procedures, as of the end of the period covered by this report based
7      on such evaluation; and

8          d.      Disclosed in this report any change in the
registrant's internal control over financial reporting that occurred
9      during the registrant's most recent fiscal quarter (the registrant's
fourth fiscal quarter in the case of an annual report) that has
10     materially affected, or is reasonably likely to materially affect, the
registrant's internal control over financial reporting; and
11

12     5.      The registrant's other certifying officer and I have
disclosed, based on our most recent evaluation of internal control
13     over financial reporting, to the registrant's auditors and the audit
committee of the registrant's board of directors (or persons
14     performing the equivalent functions):
15

16         a.      All significant deficiencies and material weaknesses
in the design or operation of internal control over financial
17     reporting which are reasonably likely to adversely affect the
registrant's ability to record, process, summarize and report
18     financial information; and

19         b.      Any fraud, whether or not material, that involves
management or other employees who have a significant role in the
20     registrant's internal control over financial reporting.

21     32.     The Company's 2010 Form 10-K further included, as Exhibit 31.2, a

22     substantially identical certification signed by then-CFO Koch.

23     33.     On March 14, 2011, Impax issued a press release announcing "statistically

24     significant, positive, top-line results of the ADVANCE-Parkinson's Disease (PD) Phase III

25     clinical study of the safety and efficacy of [Rytary]." The press release did not offer any

26     warning relating to the Company's quality control problems or risks to the commercialization of

27     Rytary due to manufacturing deficiencies.

28

1   34.   On May 3, 2011, Impax issued a press release announcing its financial results for

2   the first quarter of 2011. The Company reported net income of $13.9 million, or $0.21 in

3   diluted earnings per share. The release stated in part:

4       "We believe our pending generic pipeline of 39 products and 77
        under development potentially includes other exclusive launch
5       opportunities. We are also enthused about the recent positive
        phase III results for IPX066, our leading brand product candidate
6       for Parkinson's disease. All of these pipeline opportunities provide
7       the potential to fuel future growth."

8   35.   In connection with its earnings release, Impax hosted a conference call for

9   investors and analysts. During this call, the following exchange occurred:

10      [Analyst:] [G]iven some of the generic competitors out there and
        their problems and the FDA's increased scrutiny, can I just ask you
11      to opine about your manufacturing facilities in general, quality
        control systems, when your last inspection was, and any
12      outstanding 483s, stuff like that?

13      [Hsu:] Let me try to answer the question. Obviously, quality is
14      very important for us, and if you look at the last FDA inspection, it
        was at the end of the last year, early January this year and yes, we
15      have a 483 and we've been working very hard to address the 483
        issue response to the FDA. We're pretty comfortable with the
16      response that we sent [in to] the FDA.

17      [Analyst:] Is that at the Hayward facility?

18      [Hsu:] That is correct.

19      [Analyst:] And is there a chance that that outstanding issue affects
20      pending approvals or tentative approvals you may have with [the
        FDA's Office of Generic Drugs]?
21
        [Hsu:] Obviously, that's a tough question to answer. I do not
22      know at this point but I think we've done a wonderful job in terms
        of responding to the FDA. Like any other quality [oriented]
23      company, we made a lot of necessary changes to satisfy FDA's
24      citation on that.

25      [Analyst] How would you characterize the magnitude of the
        problem? Was it a big problem or a little problem?
26
        [Hsu:] It's hard to say. I don't know. At this point *it's not a huge
27      483* so we are hoping that the FDA is satisfied with our response.

28                      *       *       *

[Analyst:] How many observations in the 483?

[Hsu:] I don't think we disclosed that on this. *Not a significant number, let's put it this way.*

(emphases added).

36. On May 5, 2011, Impax filed with the SEC a quarterly report on Form 10-Q for its first quarter ended March 31, 2011, which included the same results previously reported in the Company's May 3, 2011 press release and certifications substantially identical to those described in paragraphs 31 and 32.

37. On May 10, 2011, Impax's share price closed at $28.73 per share, its Class Period high.

38. On June 3, 2011, Impax received a warning letter from the FDA, dated May 31, 2011, related to the inspection the FDA conducted of its Hayward Facility between December 13, 2010 and January 21, 2011 ("May 2011 warning letter"). On June 6, 2011, Impax issued a press release providing an update on the FDA site inspection of the Hayward Facility and disclosing its receipt of the warning letter. The release stated in part:

> Impax Laboratories, Inc. today announced that late Friday, June 3, it received a warning letter from the U.S. Food and Drug Administration (FDA) dated May 31, 2011 related to an on-site inspection of its Hayward, Calif. manufacturing facility conducted between December 13, 2010 and January 21, 2011.
>
> In the warning letter, the FDA cited deviations from current Good Manufacturing Practice (cGMP) for Finished Pharmaceuticals. The deviations cited related to sampling and testing of in process materials and drug products, production record review and our process for investigating the failure of certain manufacturing batches (or portions of batches) to meet specifications. As a result of the FDA's initial inspection results, the Company conducted a voluntary recall in March of 2011 of five lots of Fenofibrate capsules 200 mg at the wholesale level and took additional remedial actions as noted below.
>
> The Company notes that the observations cited in the letter relate to the Hayward manufacturing facility only, and do not relate to any of the Company's other facilities. It also notes that until remedial action is complete and the FDA has confirmed compliance with cGMP, approval of pending and new applications listing the Hayward facility as a manufacturing location of finished

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS    11

dosage forms may be withheld. The warning letter did not place restrictions on the Company's ability to manufacture and ship product. While during the past three months, the production level at the Hayward facility was reduced to implement several key changes in the Company's quality system, the Company is now producing product at a normal pace and does not currently plan to reduce its product manufacturing or hold shipments of finished product.

Following the initial inspection, the Company took a number of steps to thoroughly review its manufacturing systems and standards, including the use of leading consulting firms to assist in that review. This work is ongoing and the Company is committed to improving its manufacturing practices. The Company will continue to work to fully address the FDA's concerns and to resolve these issues. The Company will respond to the FDA's warning letter within the mandated 15 business day response period.

"Impax remains committed to providing the highest quality products to our customers and working with the FDA to diligently resolve any issues," said Larry Hsu, Ph.D., president and CEO, Impax Laboratories. "We intend to promptly respond to the FDA's letter, and have already begun to implement changes and establish procedures that address the observations cited during the inspection. We will work diligently to remedy any outstanding issues in a timely manner."

Dr. Hsu concluded, "We don't anticipate that this manufacturing setback will delay our ongoing research and development activities. We expect to continue to develop our generic pipeline of 82 products and two brand products."

On a conference call held in connection with this press release, the Company noted that an FDA re-inspection of the Hayward Facility would be required in connection with the May 2011 warning letter in order for the FDA to grant approvals to Impax products.

39. On June 16, 2011, Impax filed a Form 8-K with the SEC, which stated in part:

On June 15, 2011, Charles V. Hildenbrand, Senior Vice President, Operations, informed Impax Laboratories, Inc. (the "Company") of his intent to resign effective June 17, 2011. The Company is currently aggressively seeking a new executive with experience in pharmaceutical manufacturing and operations. On an interim basis, Mr. Hildenbrand's responsibilities will be assumed by the Chief Executive Officer of the Company.

1    40.    Subsequently, on June 21, 2011, Impax issued a press release announcing that it

2    had hired two executives to improve quality control and manufacturing processes. The release

3    stated in part:

> Impax Laboratories, Inc. today announced two executive
> appointments that will strengthen the company's leadership in the
> critical areas of operations and quality affairs. The company has
> appointed Mark Fitch as Senior Vice President Global Operations
> and Jeff Nornhold as Senior Vice President Global Quality Affairs.
> Both Mr. Fitch and Mr. Nornhold will report to Impax's President
> and Chief Executive Officer, Larry Hsu, Ph.D.
>
> Mr. Fitch brings over 35 years of pharmaceutical experience to his
> role at Impax. He joins the company from Nycomed US, where he
> was Senior Vice President Operations. Prior to joining Nycomed,
> he was a consultant in the pharmaceutical industry, and before that
> he spent 10 years with Mylan Pharmaceuticals as a member of the
> executive team that led Mylan through its critical growth period,
> including key acquisitions. During his tenure with Mylan, he was
> responsible for all manufacturing plant operations, facilities
> engineering, maintenance, safety, security and technical support at
> solid dosage form plants in West Virginia and Puerto Rico. He
> earned his Bachelor of Science degree in pharmacy and
> pharmaceutical sciences at Purdue University.
>
> Mr. Nornhold, who has 20 years of pharmaceutical industry
> experience, joins Impax from Watson Pharmaceuticals, Inc., where
> he was most recently Vice President, Quality Operations -
> International, and was responsible for outside of the U.S.
> manufacturing sites for both dosage and active pharmaceutical
> ingredients. While at Watson, he also served as Vice President
> U.S. Quality Operations leading the development and execution of
> quality initiatives for all U.S. sites. Prior to joining Watson in
> 2000, he held numerous leadership positions within the
> pharmaceuticals industry. He earned a Bachelor of Science degree
> in chemistry from Bowling Green State University and a Master's
> in Business Administration from the University of Southern
> California Marshall School of Business.
>
> "We are very pleased that Mark and Jeff have joined Impax to
> oversee these two very critical areas of our business," said Larry
> Hsu, Ph.D., president and CEO of Impax. "They are accomplished
> executives with a strong track record and extensive pharmaceutical
> and business leadership experience.    We have experienced
> significant growth the past several years and their addition further
> enhances our management team."

41.     On August 2, 2011, Impax issued a press release announcing its second quarter
2011 financial results. The Company reported net income of $12.6 million, or $0.19 in diluted
EPS. The release stated in part:

> "Our second quarter 2011 revenues and earnings were lower than
> the prior year period primarily due to higher second quarter 2010
> sales from the remaining exclusive period of generic Flomax(R).
> However, our second quarter 2011 revenues improved sequentially
> over the first quarter 2011 revenues and exceeded our
> expectations," said Larry Hsu, Ph.D., president and CEO, Impax
> Laboratories, Inc. "The sequential improvement was primarily due
> to the late April receipt of our supplier's initial product shipment
> from 2011 quota of generic Adderall XR(R) which resulted in
> second quarter generic Adderall XR(R) product sales of $58.2
> million, as compared to $36.1 million in the first quarter of 2011."

*     *     *

> Dr. Hsu further stated, "We are working expeditiously to resolve
> the manufacturing observations raised in the warning letter to the
> satisfaction of the U.S. Food and Drug Administration (FDA). In
> late June 2011, we submitted our warning letter response and will
> continue to cooperate with the FDA to resolve the observations.
> We have already made significant manufacturing and quality
> control systems improvements and believe we have addressed a
> number of the FDA's observations. Upon our internal completion,
> we will request a re-inspection of our Hayward facility by the
> FDA, the timing of which is wholly dependent upon the FDA's
> availability. Based on our most recent estimate, we expect to incur
> charges of approximately $10.0 million in 2011 related to the
> development and implementation of manufacturing and quality
> control systems improvements associated with our response to the
> observations raised in the warning letter."

> "This current interruption has not impacted our ability to execute
> our long-term growth strategy. We have a significant pipeline of
> generic products pending at the FDA and continue to file
> Abbreviated New Drug Applications which we believe will create
> additional product launch opportunities.  Regarding our brand
> business, we remain on schedule to file a New Drug Application
> for IPX066, our leading brand product candidate for Parkinson's
> Disease, in the fourth quarter of 2011.  We also remain active
> pursuing external opportunities with the potential to further drive
> future growth," concluded Dr. Hsu.

1    42.    Following the market's close on August 4, 2011, Impax filed with the SEC a

2    Form 10-Q for its second quarter ended June 30, 2011, which included the same results

3    previously reported in the Company's August 2, 2011 press release. The Form 10-Q stated in

4    part:

> In June 2011, we received a warning letter from the U.S. Food and Drug Administration (FDA) related to an on-site FDA inspection of our Hayward, California manufacturing facility conducted between December 13, 2010 and January 21, 2011. In the warning letter, the FDA cited deviations from current Good Manufacturing Practices (cGMP), which are extensive regulations governing manufacturing processes, stability testing, record keeping and quality standards. In summary, the FDA observations related to sampling and testing of in-process materials and drug products, production record review, and our process for investigating the failure of certain manufacturing batches (or portions of batches) to meet specifications. The FDA observations do not place restrictions on our ability to manufacture and ship our products. The warning letter is available on the FDA's website at www.fda.gov.
>
> We have taken a number of steps to thoroughly review our quality control and manufacturing systems and standards and are working with several third-party experts to assist us with our review. This work is ongoing and we are committed to improving our quality control and manufacturing practices. In late June 2011, we filed our response with the FDA and will continue to cooperate with the FDA to resolve the FDA observations. We have made significant quality improvements and are working to complete the material elements of our internal work as quickly as possible. Upon the completion of our internal work, we will request a FDA re-inspection of our Hayward, California manufacturing facility, with the goal of being able to close out the observations to FDA's satisfaction by the early part of first quarter 2012.

22    43.    The Company's August 4, 2011 Form 10-Q included certifications substantially

23    identical to those described in paragraphs 31 and 32.

24    44.    On November 1, 2011, Impax issued a press release announcing its financial

25    results for the third quarter of 2011. The Company reported net income of $20.0 million, or

26    $0.30 in diluted EPS. The release stated in part:

> "During the third quarter, we continued to make significant quality improvements and are diligently working to resolve the manufacturing observations raised in the June warning letter.

These efforts remain a top priority throughout the Company. However, it has not distracted us from continuing to focus on our business as evidenced by our profitable results in the third quarter or hindered our investments in new product opportunities," said Larry Hsu, Ph.D., president and CEO, Impax Laboratories, Inc.

Dr. Hsu continued, "We have provided the U.S. Food and Drug Administration (FDA) with updates on our progress with quality improvements and established dialogue with the agency. We have implemented a global quality improvement program with the assistance of our external consultants. Our focus remains on working expeditiously to meet our internal goal of closing out the warning letter by the end of February 2012, the timing of which is dependent upon the FDA's availability to re-inspect our Hayward facility."

Dr. Hsu concluded, "Throughout this process we have continued to focus on growth initiatives. Our generic pipeline of 47 products pending approval has never been larger and continues to expand as we have already filed 10 new product applications in 2011. Within our brand division, we remain on track to file a New Drug Application for IPX066, our leading brand product candidate for Parkinson's Disease, by the end of this year. In addition, we continue to pursue internally developed products and business development candidates that are consistent with our stated objectives of high growth and high margin opportunities."

45. Following the close of the markets on November 3, 2011, Impax filed with the SEC a Form 10-Q for its third quarter ended September 30, 2011, which included the same results previously reported in the Company's November 1, 2011 press release. The Form 10-Q stated in part:

We have taken a number of steps to thoroughly review our quality control and manufacturing systems and standards and are working with several third-party experts to assist us with our review. This work is ongoing and we are committed to improving our quality control and manufacturing practices. In late June 2011, we filed our response with the FDA and will continue to cooperate with the FDA to resolve the FDA observations. We have made significant quality improvements and are working to complete the material elements of our efforts as quickly as possible with the goal of being able to close out the warning letter by the end of February 2012.

46. The Company's November 3, 2011 Form 10-Q included certifications substantially identical to those described in paragraphs 31 and 32.

47.     On February 9, 2012, Impax issued a press release titled "Impax Laboratories

Provides Update on Status of Warning Letter Resolution for its Hayward Facility," which stated

in part:

> Impax Laboratories, Inc. today provided an update on the status of its resolution of the previously disclosed warning letter issued by the U.S. Food and Drug Administration (FDA) covering its Hayward manufacturing facility. Late last year, Impax received an acknowledgement letter from the FDA stating that it had received a complete response from Impax to the warning letter. However, a satisfactory re-inspection is required to close out the warning letter and the re-inspection by the FDA has not occurred to date. Therefore, the Company's previously stated goal for completing the closing out of the warning letter before the end of February 2012 may not occur. Until such re-inspection is completed and the warning letter is closed out, approval of the Company's pending drug applications listing the Hayward manufacturing facility as a manufacturing location may be withheld by the FDA.

> "We worked as quickly and diligently as possible to ensure we addressed all FDA concerns, and look forward to a timely resolution," said Larry Hsu, Ph.D., president and CEO, Impax Laboratories. "At the same time, we have been successfully executing our growth strategy, including pursuing external growth opportunities, further advancing our generic and brand R&D pipeline, and servicing our customers. Our focus on achieving these objectives is evident in several recent positive events, including obtaining a long-term licensing agreement for Zomig®, advancing our pipeline with the filing of a New Drug Application for IPX066 and submitting 11 Abbreviated New Drug Applications in 2011."

> As part of its Global Quality Improvement Program, the Company said it has revised its Standard Operating Procedures, made key staffing changes, revalidated manufacturing processes, conducted additional training, and purchased and validated new equipment.

> Hsu added, "Improving the operation of all of our production facilities and company-wide quality systems has strengthened our Company, and continuous improvement will remain a top priority. We appreciate the communication and guidance provided by the FDA throughout this process and look forward to their re-inspection of our Hayward facility."

48.     On February 28, 2012, Impax issued a press release announcing its fourth quarter

and full year 2011 financial results. The Company reported net income of $21.9 million, or

1  $0.33 in diluted EPS, for the fourth quarter of 2011. Additionally, the Company reported net

2  income of $65.5 million, or $0.97 in diluted EPS, for the full year of 2011. The release stated in

3  part:

4         Dr. Hsu concluded, "We are also excited about the prospects that
           our brand business offers from both our research efforts and
5         business development initiatives. Our New Drug Application for
           IPX066 was accepted by the FDA and the process to prepare for
6         launch upon approval is well underway. In addition, our License
           Agreement for Zomig® will contribute meaningfully to our 2012
7         and 2013 financial performance. We will continue to actively
           pursue generic and branded internally developed products and
8         business development candidates that offer long term growth
9         opportunities."

10    49.    After the markets' close on February 28, 2012, Impax filed with the SEC a Form

11  10-K for its fiscal year ended December 31, 2011, which included the same results previously

12  reported in the Company's February 28, 2012 press release. The Form 10-K stated in part:

13         We have taken a number of steps to thoroughly review and
           remediate our quality and manufacturing systems and standards
14         and are working with several third-party experts to assist us. This
           work is ongoing, and we have made significant quality
15         improvements and are committed to improving our quality control
           and manufacturing practices. From late June 2011 through the end
16         of 2011, we filed our response and subsequent updates with the
           FDA and have continued to cooperate with the FDA to resolve the
17         FDA observations.    In December 2011, we received an
           acknowledgment letter from the FDA stating that it had received a
18         complete response from us to the warning letter.
19

20    50.    The Company's February 28, 2012 Form 10-K included certifications

21  substantially identical to those described in paragraphs 31 and 32.

22    51.    On May 1, 2012, Impax issued a press release announcing its financial results for

23  the first quarter of 2012. The Company reported net income of $12.4 million, or $0.18 in

24  diluted EPS. Additionally, the Company provided an update on the FDA's re-inspection of the

25  Hayward Facility. The release stated in part:

26         Separately, the U.S. Food and Drug Administration (FDA)
           completed its re-inspection of the Company's Hayward
27         manufacturing facility in connection with the previously disclosed
           warning letter. In addition to the re-inspection relating to the
28         warning letter, the FDA conducted a general GMP inspection of

the Company's Hayward operations. At the conclusion of this additional inspection, the FDA issued a new Form 483 with observations primarily relating to the Company's Quality Control Laboratory. There were no repeat deficiencies or observations set forth in the Form 483 and the observations described therein are different from the observations raised in the warning letter. The Company has timely submitted its response to the Form 483 to the FDA.

Currently, the Company has not been informed by the FDA of the impact this latest Form 483 will have on the resolution or timing of resolving the warning letter or whether any further regulatory action may be taken as to its manufacturing operations. The Company has no control over the Agency's timing to review its response or to evaluate its corrective actions. In the interim, the Company continues to manufacture products and is working diligently to address the observations raised by the FDA in the Form 483.

Dr. Hsu said "While we believe we have addressed the observations raised in the warning letter and have instituted appropriate corrective actions, we are disappointed to have received a Form 483 on these new observations. We believe we have submitted a complete response to the Form 483 and are working diligently to enhance our quality control procedures. We have already taken decisive action, including a change in the testing laboratory leadership, as well as strengthened and clarified laboratory testing standard operating procedures."

52. Following the close of the markets on May 3, 2012, Impax filed with the SEC a Form 10-Q for its first quarter ended March 31, 2012, which included the same results previously reported in the Company's May 1, 2012 press release. The Form 10-Q stated in part:

We have taken a number of steps to thoroughly review our quality control and manufacturing systems and standards and are working with several third-party experts to assist us with our review. This work is ongoing and we are committed to improving our quality control and manufacturing practices.

53. The Company's May 3, 2012 Form 10-Q included certifications substantially identical to those described in paragraphs 31 and 32.

54. On June 29, 2012, Impax issued a press release announcing the resignation of Defendant Koch, which stated in part:

Impax Laboratories, Inc. (the "Company") today announced that Arthur A. Koch, the Company's Executive Vice President,

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    19

1
2
3

Finance, and Chief Financial Officer, has informed the Company of his decision to resign from his position with the Company to pursue other opportunities. Mr. Koch will assist the Company to help ensure a smooth transition.

4
5
6

The Company also announced that Bryan M. Reasons, who currently serves as Vice President, Finance, has been appointed as Acting Chief Financial Officer and that the Company will initiate a search for a permanent successor.

7
8
9
10

"During the past seven years that Arthur Koch has been with us, the Company has grown tremendously, and I deeply appreciate his service to the Company," said Larry Hsu, president and CEO of Impax Laboratories. "Bryan Reasons is an able and experienced financial executive who will be the interim CFO reporting to me as we conduct an external search for a permanent CFO."

11

55.     On July 31, 2012, Impax issued a press release announcing its second quarter

12

2012 financial results. The Company reported net income of $18.7 million, or $0.27 in diluted

13

EPS. The release further stated in part:

14
15
16
17
18
19

"The positive second quarter results reflect our Zomig® tablets sales in the U.S. utilizing our expanded neurology focused brand sales force, as well as increased receipt of shipments of generic Adderall XR® from our third-party supplier which led to higher sales in the quarter," said Larry Hsu, Ph.D., president and CEO, Impax Laboratories, Inc. "We are excited that our brand sales force began promoting and sampling Zomig® tablets in the U.S. on April 1. This product will support the growth of our commercial organization as we prepare for the potential launch of Rytary™, our first internally developed brand product for Parkinson's Disease."

20
21
22
23
24

"The U.S. Food and Drug Administration (FDA) recently completed a preapproval inspection for Rytary™ and an undisclosed generic product at our Taiwan facility and there were no Form 483 observations. We continue to work at resolving the recent observation made by the FDA in Hayward and have been notified that a satisfactory re-inspection will be necessary to close out the warning letter," Dr. Hsu continued.

25

56.     Following the close of the markets on August 2, 2012, Impax filed with the SEC

26

a Form 10-Q for its second quarter ended June 30, 2012, which included the same financial

27

results previously reported in the Company's July 31, 2012 press release. The Form 10-Q stated

28

in part:

In June 2011, we received a warning letter from the FDA related to an on-site FDA inspection of our Hayward, California manufacturing facility conducted between December 13, 2010 and January 21, 2011. In the warning letter, the FDA cited deviations from current Good Manufacturing Practices (cGMP), which are extensive regulations governing manufacturing processes, stability testing, record keeping and quality standards. In summary, the FDA observations set forth in the warning letter related to sampling and testing of in-process materials and drug products, production record review, and our process for investigating the failure of certain manufacturing batches (or portions of batches) to meet specifications. The FDA observations do not place restrictions on our ability to manufacture and ship our products.

From late June 2011 through the end of 2011, we filed our response and subsequent updates with the FDA and have continued to cooperate with the FDA to resolve the FDA observations. In December 2011, we received an acknowledgement letter from the FDA stating that it had received a complete response from us to the warning letter. During the quarter ended March 31, 2012, the FDA completed a re-inspection of our Hayward manufacturing facility in connection with the warning letter and in addition, a general GMP inspection. As a result of the general GMP inspection of our Hayward operations, the FDA issued a Form 483, with observations primarily relating to our Quality Control Laboratory. We have been notified by the FDA that a satisfactory re-inspection of our Hayward manufacturing facility is required to close out the warning letter and such re-inspection by the FDA has not occurred to date.

We have taken a number of steps to thoroughly review our quality control and manufacturing systems and standards and are working with several third-party experts to assist us with our review. This work is ongoing and we are committed to improving our quality control and manufacturing practices.

57. The Company's August 2, 2012 Form 10-Q included a certification signed by CEO Hsu substantially identical to that described in paragraph 31 and a certification signed by CFO Reasons substantially similar to that described in paragraph 32.

58. On October 12, 2012, Impax issued a press release announcing that the FDA had extended the Prescription Drug User Fee Act date for review of the New Drug Application ("NDA") for Rytary from October 21, 2012 to January 21, 2013.

1    59.    On October 30, 2012, Impax issued a press release announcing its third quarter

2    2012 financial results. The Company reported net income of $20.0 million, or $0.29 in diluted

3    EPS. The release stated in part:

4
5
6
7

> "Our U.S. promotional efforts of Zomig® exceeded our expectations in the third quarter and support our brand commercial organization as we continue to prepare for the potential launch of Rytary™," said Larry Hsu, Ph.D., president and CEO, Impax Laboratories, Inc. "The success of our brand business is an important element to the future growth of the Company."

8
9
10
11
12
13
14

> "A few weeks ago, the U.S. Food and Drug Administration (FDA) notified us that Rytary's™ New Drug Application review date would be extended three months to January 21, 2013. We continue to have dialogue with the FDA on both this application and the resolution of the Hayward warning letter. We expect that upon the resolution of the warning letter, we should begin to see approvals for generic products in backlog and will look to commercialize these opportunities assuming the market dynamics remain attractive. In the meantime, we continue to explore investment opportunities that can deliver growth and progress the Company towards its long term generic and brand division goals," Dr. Hsu concluded.

15   60.    After the markets' close on November 2, 2012, Impax filed with the SEC a

16   Form 10-Q for its third quarter ended September 30, 2012, which included the same financial

17   results previously reported in the Company's October 30, 2012 press release. The Form 10-Q

18   stated in part:

19
20
21
22
23
24
25
26

> In June 2011, we received a warning letter from the FDA related to an on-site FDA inspection of our Hayward, California manufacturing facility conducted between December 13, 2010 and January 21, 2011. In the warning letter, the FDA cited deviations from current Good Manufacturing Practices (cGMP), which are extensive regulations governing manufacturing processes, stability testing, record keeping and quality standards. In summary, the FDA observations set forth in the warning letter related to sampling and testing of in-process materials and drug products, production record review, and our process for investigating the failure of certain manufacturing batches (or portions of batches) to meet specifications.

27
28

> From late June 2011 through the end of 2011, we filed our response and subsequent updates with the FDA and have continued to cooperate with the FDA to resolve the FDA observations. In December 2011, we received an acknowledgement letter from the

1
2
3
4
5
6
7

FDA stating that it had received a complete response from us to the warning letter. During the quarter ended March 31, 2012, the FDA completed a re-inspection of our Hayward manufacturing facility in connection with the warning letter and in addition, a general GMP inspection. As a result of the general GMP inspection of our Hayward operations, the FDA issued a Form 483, with observations primarily relating to our Quality Control Laboratory. We have been notified by the FDA that a satisfactory re-inspection of our Hayward manufacturing facility is required to close out the warning letter and such re-inspection by the FDA has not occurred to date. The FDA observations do not place restrictions on our ability to manufacture and ship our products.

8
9
10
11

We have taken a number of steps to thoroughly review our quality control and manufacturing systems and standards and are working with several third-party experts to assist us with our review. This work is ongoing and we are committed to improving our quality control and manufacturing practices.

12       61.     The Company's November 2, 2012 Form 10-Q included certifications

13   substantially identical to those described in paragraph 57.

14       62.     On December 13, 2012, Impax issued a press release announcing the

15   appointment of Defendant Reasons as CFO, which stated in part:

16
17
18

Impax Laboratories, Inc. announced today that Bryan M. Reasons has been appointed senior vice president and chief financial officer (CFO). Mr. Reasons, 45, joined Impax Laboratories in January 2012 as vice president, Finance, and has served as acting CFO since June 2012.

19
20
21
22
23

"Following a nationwide search, Bryan Reasons was selected as the best candidate to fill the CFO role," said Larry Hsu, Ph.D., president and CEO, Impax Laboratories. "He has a breadth of knowledge across accounting and finance, combined with extensive merger and acquisition experience within the pharmaceutical industry. In less than two years, we have significantly transformed Impax's leadership team across a number of functions as we focus on executing our growth strategy."

24       63.     On January 21, 2013, Impax issued a press release announcing that the FDA

25   would require a satisfactory re-inspection of the Hayward Facility as a result of the May 2011

26   warning letter before granting approval to the Company's NDA for Rytary given the Hayward

27
28

1  Facility's involvement in the development and manufacture of Rytary. The release provided in

2  part:

3          Impax Pharmaceuticals, a division of Impax Laboratories, Inc.,
          announced today that the U.S. Food and Drug Administration
4          (FDA) issued a complete response letter regarding the New Drug
          Application (NDA) for RYTARY™ (IPX066), an extended-release
5          capsule formulation of carbidopa-levodopa, a potential treatment
          for the symptomatic treatment of Parkinson's disease currently
6          under review in the United States.

7          The complete response letter indicates that the FDA requires a
8          satisfactory re-inspection of the company's Hayward facility as a
          result of the warning letter issued in May 2011 before the
9          company's NDA may be approved due to the facility's
          involvement in the development of RYTARY, and supportive
10         manufacturing and distribution activities. During the assessment
          of the NDA, the company withdrew the Hayward site as an
11         alternative site of commercial production at launch.

12
          "We will work with the FDA on the appropriate next steps for the
13         RYTARY application," said Larry Hsu, Ph.D., president and CEO,
          Impax Laboratories, Inc. "We remain committed to resolving the
14         warning letter and bringing this new treatment option to patients
15         who are suffering from Parkinson's disease."

16         A complete response letter is issued by the FDA's Center for Drug
          Evaluation and Research when the review cycle for a drug is
17         complete and the application is not yet ready for approval.

18      64.     On February 25, 2013, Impax issued a press release announcing its fourth quarter

19  and full year 2012 financial results. The Company reported net income of $4.8 million, or $0.07

20  in diluted EPS, for the fourth quarter of 2012. Additionally, the Company reported net income

21  of $55.9 million, or $0.82 in diluted EPS, for the full year of 2012. The release stated in part:

22         "While our adjusted full year 2012 financial results improved over
          last year, it was still a challenging year for Impax. We faced a few
23         obstacles on two of our key objectives for 2012 - successfully
          resolving the warning letter at our Hayward facility and obtaining
24         approval of our first internally developed branded product
25         candidate RYTARY™," said Larry Hsu, Ph.D., president and
          CEO, Impax Laboratories, Inc. "The resolution of the quality
26         issues in Hayward continues to be a top priority throughout the
27         company."

28                      *       *       *

Dr. Hsu continued, "These obstacles, however, are not preventing us from continuing to invest in developing future generic and branded product opportunities or moving forward with our long-term growth strategy.  In 2012 we made significant progress in diversifying our generics business by expanding our alternative dosage form portfolio from 9 products in 2011 to 33 currently marketed and pipeline products.  We also focused on building a brand pipeline through both internal R&D and external business development activities."

"We ended 2012 with almost $300 million in cash and short-term investments, and no debt.  In addition, we expect the pre-tax receipt of approximately $150 million from Endo Health Solutions and Shire under previously announced agreements.  These resources combined with our strong balance sheet will help to support our business objectives," concluded Dr. Hsu.

65.     Prior to the markets' open on February 26, 2013, Impax filed with the SEC a Form 10-K for its fiscal year ended December 31, 2012, which included the same financial results previously reported in the Company's February 25, 2013 press release.  The Form 10-K stated in part:

In late May 2011, we received a warning letter from the U.S. Food and Drug Administration (FDA) related to an on-site FDA inspection of our Hayward, California manufacturing facility conducted between December 13, 2010 and January 21, 2011.  In the warning letter, the FDA cited deviations from current Good Manufacturing Practices (cGMP), which are extensive regulations governing manufacturing processes, stability testing, record keeping and quality standards.  In summary, the FDA observations set forth in the warning letter related to sampling and testing of in-process materials and drug products, production record review, and our process for investigating the failure of certain manufacturing batches (or portions of batches) to meet specifications.

From late June 2011 through the end of 2011, we filed our response and subsequent updates with the FDA and have continued to cooperate with the FDA to resolve the FDA observations.  In December 2011, we received an acknowledgement letter from the FDA stating that it had received a complete response from us to the warning letter.  During the quarter ended March 31, 2012, the FDA completed a re-inspection of our Hayward manufacturing facility in connection with the warning letter and in addition, a general GMP inspection.  As a result of the general GMP inspection of our Hayward operations, the FDA issued a Form 483, with observations primarily relating to our Quality Control Laboratory. We have been notified by the FDA that a satisfactory re-inspection

of our Hayward manufacturing facility is required to close out the warning letter. The FDA observations do not place restrictions on our ability to manufacture and ship our products.

We have taken a number of steps to thoroughly review our quality control and manufacturing systems and standards and are working with several third-party experts to assist us with our review. This work is ongoing and we are committed to improving our quality control and manufacturing practices. We cannot be assured, however, that the FDA will be satisfied with our corrective actions and as such, we cannot be assured of when the warning letter will be closed out. Unless and until the warning letter is closed out, it is possible we may be subject to additional regulatory action by the FDA as a result of the current or future FDA observations, including, among others, monetary sanctions or penalties, product recalls or seizure, injunctions, total or partial suspension of production and/or distribution, and suspension or withdrawal of regulatory approvals. Additionally, the FDA has withheld and may continue to withhold approval of pending drug applications listing our Hayward, California facility as a manufacturing location of finished dosage forms until these FDA observations are resolved. If we are unable to promptly correct the issues raised in the warning letter, our business, consolidated results of operations and consolidated financial condition could be materially adversely affected.

66.     The Company's February 26, 2013 Form 10-K included certifications substantially identical to those described in paragraph 57.

**THE TRUTH IS REVEALED,
CAUSING IMPAX'S STOCK PRICE TO FALL**

67.     Then, on March 4, 2013, Impax disclosed that the FDA had completed another re-inspection of the Hayward Facility. The FDA's inspection covered three areas: (1) a re-inspection of the Hayward Facility to verify the implementation of corrective actions by the Company in response to the May 2011 warning letter; (2) a Pre-Approval Inspection for Rytary because data for the drug was generated at the Hayward Facility; and (3) a cGMP inspection. The Company revealed that the FDA had issued a new Form 483 following its inspection, citing twelve observations at the Hayward Facility requiring correction, including three repeat manufacturing problems that had not been corrected following prior FDA inspections performed before the issuance of the May 2011 warning letter.

1    68.    During a conference call hosted by the Company that day, the Company further

2    revealed that due to the manufacturing deficiencies, it did not expect to be able to launch Rytary

3    or a generic version of Concerta until 2014.

4    69.    Additionally on March 4, 2013, Impax filed a Form 8-K with the SEC providing

5    a redacted version of the Form 483.

6    70.    In reaction to these disclosures, Impax's stock price declined $5.20 per share, or

7    26 percent, to close at $14.80 per share on March 5, 2013, on extraordinary trading volume.

8    71.    The true facts, which were known by the Defendants but concealed from the

9    investing public during the Class Period, were as follows:

10    (a)    the Company failed to maintain proper quality control and manufacturing

11    practices at its Hayward Facility in violation of current Good Manufacturing Practices

12    ("cGMPs");

13    (b)    the Company failed to take proper remedial actions to correct quality

14    control issues previously identified by the FDA in prior inspections of the Hayward Facility;

15    (c)    the extent of the adverse effect that the manufacturing deficiencies at the

16    Hayward Facility could have on the Company's ability to successfully launch its new drug,

17    Rytary; and

18    (d)    as a result of the foregoing, Impax lacked a reasonable basis for its

19    positive statements about the Company and its outlook, including statements about its ability to

20    launch Rytary or generic Concerta in 2013.

21    72.    As a result of Defendants' false statements, Impax common stock traded at

22    artificially inflated levels during the Class Period. However, after the revelations detailed above

23    were disclosed to the market, investors sold the Company's shares, causing Impax's share price

24    to fall significantly from its Class-Period high.

25    **LOSS CAUSATION**

26    73.    During the Class Period, as detailed herein, Defendants made false and

27    misleading statements, engaged in a scheme to deceive the market and a course of conduct that

28    artificially inflated the prices of Impax common stock, and operated as a fraud or deceit on

1  Class Period purchasers of Impax common stock by misrepresenting the state of the Company's

2  quality control, manufacturing processes, regulatory developments, and business prospects.

3  Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to

4  the market, the price of Impax common stock fell precipitously, as the prior artificial inflation

5  came out of the price over time. As a result of their purchases of Impax common stock during

6  the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages,

7  under the federal securities laws.

## SCIENTER

9  74.  During the Class Period, Defendants had both the motive and opportunity to

10  commit fraud. They also had actual knowledge of the misleading nature of the statements they

11  made or acted with deliberate recklessness with regard to the true information known to them at

12  the time for the reasons discussed above. In so doing, Defendants committed acts, and practiced

13  and participated in a course of business that operated as a fraud or deceit on purchasers of Impax

14  common stock during the Class Period.

## NO SAFE HARBOR

16  75.  Impax's verbal "Safe Harbor" warnings accompanying their oral forward-

17  looking statements ("FLS") issued during the Class Period were ineffective to shield those

18  statements from liability.

19  76.  Defendants are also liable for any false or misleading FLS pleaded because, at

20  the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS

21  was authorized and/or approved by an executive officer of Impax who knew that the FLS was

22  false. None of the historic or present tense statements made by Defendants were assumptions

23  underlying or relating to any plan, projection, or statement of future economic performance, as

24  they were not stated to be such assumptions underlying or relating to any projection or statement

25  of future economic performance when made, nor were any of the projections or forecasts made

26  by Defendants expressly related to, or stated to be dependent on, those historic or present tense

27  statements when made.

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                    28

## APPLICABILITY OF PRESUMPTION OF
## RELIANCE: FRAUD ON THE MARKET

77.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Plaintiff and other members of the Class purchased Impax common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

78.     At all relevant times, the markets for Impax common stock were efficient for the following reasons, among others:

(a)     as a regulated issuer, Impax filed periodic public reports with the SEC;

(b)     Impax regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

(c)     Impax common stock was actively traded in an efficient market, namely the NASDAQ, under the ticker symbol "IPXL."

79.     Plaintiff is also entitled to the presumption of reliance to the extent that Defendants' statements failed to disclose material facts about safety and efficacy.

1

## CLASS ACTION ALLEGATIONS

2      80.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

3   Rules of Civil Procedure on behalf of the Class. Excluded from the Class are Defendants,

4   directors, and officers of the Company, and their families and affiliates.

5      81.     The members of the Class are so numerous that joinder of all members is

6   impracticable. The disposition of their claims in a class action will provide substantial benefits

7   to the parties and the Court. As of February 15, 2013, Impax had 68,460,371 shares of common

8   stock outstanding, owned by thousands of persons.

9      82.     There is a well-defined community of interest in the questions of law and fact

10  involved in this case. Questions of law and fact common to the members of the Class that

11  predominate over questions that may affect individual Class members include:

12          (a)     whether Defendants violated the Exchange Act;

13          (b)     whether Defendants omitted and/or misrepresented material facts;

14          (c)     whether Defendants' statements omitted material facts necessary in order

15  to make the statements made, in light of the circumstances under which they were made, not

16  misleading;

17          (d)     whether Defendants knew or with deliberate recklessness disregarded that

18  their statements were false and misleading;

19          (e)     whether the prices of Impax common stock were artificially inflated; and

20          (f)     the extent of damage sustained by Class members and the appropriate

21  measure of damages.

22     83.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class

23  sustained damages from Defendants' wrongful conduct.

24     84.     Plaintiff will adequately protect the interests of the Class and has retained

25  counsel who are experienced in class action securities litigation. Plaintiff has no interests that

26  conflict with those of the Class.

27     85.     A class action is superior to other available methods for the fair and efficient

28  adjudication of this controversy.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

86. Plaintiff incorporates paragraphs 1 through 85 by reference.

87. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

88. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

        (a) employed devices, schemes, and artifices to defraud;

        (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Impax common stock during the Class Period.

89. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Impax common stock. Plaintiff and the Class would not have purchased Impax common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

90. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Impax common stock during the Class Period.

1

2

3

## COUNT II

### For Violation of § 20(a) of the Exchange Act
### Against the Individual Defendants

4

91.     Plaintiff incorporates paragraphs 1 through 90 by reference.

5

92.     The Individual Defendants acted as controlling persons of Impax within the

6

meaning of Section 20(a) of the Exchange Act.  By virtue of their power to control public

7

statements about Impax, the Individual Defendants had the power and authority to control

8

Impax and its employees.  By reason of such conduct, the Individual Defendants are liable

9

pursuant to Section 20(a) of the Exchange Act.

10

### PRAYER FOR RELIEF

11

WHEREFORE, Plaintiff prays for judgment as follows:

12

A.      Declaring this action to be a proper class action pursuant to Federal Rule of Civil

13

Procedure 23;

14

B.      Awarding Plaintiff and the members of the Class damages and interest;

15

C.      Awarding Plaintiff's reasonable costs, including attorneys' fees; and

16

D.      Awarding such equitable/injunctive or other relief as the Court may deem just

17

and proper.

18

### JURY DEMAND

19

Plaintiff demands a trial by jury.

20

DATED:  April 8, 2013                              Respectfully submitted,

21

22

23

Christopher T. Heffelfinger (Bar. No. 118058)
**BERMAN DEVALERIO LLP**

24

One California Street, Suite 900
San Francisco, California  94111

25

Telephone: (415) 433-3200
Facsimile: (415) 433-6382

26

Email: cheffelfinger@bermandevalerio.com

27

*Local Counsel for Plaintiff*
*Haverhill Retirement System*

28

Christopher J. Keller (*pro hac vice pending*)
Michael W. Stocker (Bar No. 179083)
Rachel A. Avan (*pro hac vice pending*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: ckeller@labaton.com
mstocker@labaton.com
ravan@labaton.com

*Counsel for Plaintiff Haverhill Retirement System*

## CERTIFICATION

I, Kathleen Gallant, as Administrator of Haverhill Retirement System ("Haverhill"), hereby certify as follows:

1.       I am fully authorized to enter into and execute this Certification on behalf of Haverhill. I have reviewed a complaint prepared against Impax Laboratories, Inc. ("Impax") alleging violations of the federal securities laws;

2.       Haverhill did not purchase securities of Impax at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.       Haverhill is willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4.       Haverhill's transactions in Impax securities during the Class Period are reflected in Exhibit A, attached hereto;

5.       Haverhill has not sought to serve as a lead plaintiff in any class actions filed under the federal securities laws during the last three years;

6.       Beyond its pro rata share of any recovery, Haverhill will not accept payment for serving as a lead plaintiff on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 4th. day of April, 2013.

Kathleen Gallant
*Administrator of Haverhill Retirement System*

## EXHIBIT A

## TRANSACTIONS IN IMPAX LABORATORIES, INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Sale | 02/25/11 | -115.00 | $20.63 | $2,372.45 |
| Sale | 05/25/11 | -100.00 | $26.79 | $2,679.00 |
| Sale | 06/09/11 | -925.00 | $21.36 | $19,755.60 |
| Sale | 12/14/11 | -622.00 | $17.65 | $10,976.00 |
| Sale | 12/15/11 | -813.00 | $17.69 | $14,381.32 |
| Purchase | 07/16/12 | 551.00 | $20.52 | ($11,306.08) |
| Purchase | 07/17/12 | 693.00 | $20.90 | ($14,484.12) |
| Purchase | 09/24/12 | 75.00 | $26.58 | ($1,993.31) |
| Purchase | 09/24/12 | 750.00 | $26.64 | ($19,979.10) |
| Purchase | 09/25/12 | 250.00 | $26.56 | ($6,640.83) |
| Purchase | 09/25/12 | 1,350.00 | $26.62 | ($35,940.38) |
| Purchase | 09/26/12 | 75.00 | $26.38 | ($1,978.66) |
| Purchase | 09/26/12 | 200.00 | $26.45 | ($5,289.10) |
| Purchase | 10/02/12 | 75.00 | $26.93 | ($2,019.77) |
| Purchase | 10/02/12 | 450.00 | $27.04 | ($12,168.54) |
| Purchase | 10/03/12 | 250.00 | $26.81 | ($6,702.33) |
| Purchase | 10/03/12 | 125.00 | $27.16 | ($3,394.38) |
| Purchase | 10/05/12 | 175.00 | $26.68 | ($4,668.91) |
| Purchase | 10/05/12 | 175.00 | $26.69 | ($4,670.96) |
| Sale | 10/31/12 | -575.00 | $21.42 | $12,319.32 |
| Sale | 10/31/12 | -1,025.00 | $21.31 | $21,844.19 |
| Sale | 11/01/12 | -50.00 | $21.02 | $1,051.12 |
| Sale | 11/01/12 | -175.00 | $20.65 | $3,613.12 |
| Sale | 11/01/12 | -325.00 | $21.04 | $6,837.16 |
| Sale | 11/01/12 | -1,125.00 | $20.68 | $23,270.06 |
| Sale | 11/02/12 | -325.00 | $20.51 | $6,666.40 |
| Sale | 11/05/12 | -350.00 | $20.02 | $7,006.97 |
| Purchase | 02/04/13 | 26.00 | $20.62 | ($536.12) |